**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| JOHN RIGNEY | * | |
| 2823 Nova Way | | |
| Myrtle Beach, SC 29577 | * | |
| | | CASE NO. |
| and | * | |
| | | |
| EVAN DORNBUSH | * | |
| 8805 Ashford Road | | |
| Parkville, MD 21234 | * | |
| | | |
| Individually and derivatively on behalf of | * | |
| POINT3 SECURITY, INC. and P3F LLC | | |
| | * | |
| | | |
| Plaintiffs, | * | |
| | | |
| vs. | * | |
| | | |
| CYBERPOINT3 HOLDINGS, LLC | * | |
| | | |
| RESIDENT AGENT: | * | |
|   The Corporation Trust Company | | |
|   Corporation Trust Center | * | |
|   1209 Orange Street | | |
|   Wilmington, DE 19801 | * | |
| | | |
| CYBER CAPITAL PARTNERS, LLC | * | |
| 629 5th Street, NE | | |
| Washington, DC 20002 | * | |
| | | |
| RESIDENT AGENT: | * | |
|   Jason M. Gayl | | |
|   629 5th Street, N.E. | * | |
|   Washington, DC 20002 | | |
| | * | |
| | | |
| POINT3 SECURITY, INC. | * | |
| 2711 Centerville Road, Suite 400 | | |
| Wilmington, DE 19808 | * | |
| | | |
| | * | |

RESIDENT AGENT:
    Jennifer Dornbush            *
    607 Tinker Road
    Middle River, MD 21220      *

P3F LLC                        *
1215 E. Fort Avenue, Suite 203
Baltimore, MD 21230         *

RESIDENT AGENT:         *
    Jennifer Dornbush
    8 Lochwell Court          *
    Parkville, MD 21234
                          *

JASON M. GAYL
6952 Kyleakin Court         *
McLean, Virginia 22101-1556

                          *

RICHARD SCIGAJ
2690 Mattox Creek Dr.
Oakton, Virginia 22124

               Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SUMMARY OF COMPLAINT

       Plaintiffs have filed this action for breach of contract, fraud, misappropriation of trade secrets, breach of fiduciary duty and violation of Maryland Wage Payment and Collection Act. Plaintiffs seeks to enforce the terms of a Stock Purchase Agreement pursuant to which Defendant CyberPoint3 Holdings, LLC and its alter egos Cyber Capital Partners, LLC and Jason Gayl, agreed to purchase a majority of the ownership of Point3 Security, Inc. and P3F, LLC from Plaintiffs John Rigney and Evan Dornbush, who are the founders of both companies and the inventors of the software and related trade secrets that form the core of the companies' business. The Stock Purchase Agreement required a total

payment of $5.5 million, but Defendants have refused to pay Plaintiffs any money under the agreement's terms even though the transaction closed nearly one and one-half years ago. Instead of honoring their obligations, Defendants have drained Plaintiffs' former companies of capital, misappropriated Plaintiffs' valuable trade secrets and fraudulently used the companies as a vehicle for raising capital for unrelated entities owned and operated by Defendant Gayl. Defendants Gayl and Scigaj also breached their fiduciary duties as officers of the P3 companies by failing to pursue business opportunities for the P3 companies and diverting investors away from these companies to other entities owned and controlled by Defendants. Defendants Gayl and Scigaj also wrongfully failed to pay wages to Plaintiffs under the terms of their employment and wrongfully terminated Plaintiffs in retaliation for Plaintiffs' requests that Defendants honor their obligations and pursue business opportunities for the P3 companies. Plaintiffs seek injunctive relief and compensatory and enhanced damages against Defendants.

## THE PARTIES

1.      Plaintiff John Rigney is a citizen of South Carolina residing at 2823 Nova Way, Myrtle Beach, South Carolina 29577. Mr. Rigney is a co-founder, former majority owner (with Mr. Dornbush) and member and former employee of Point3 Security, Inc. and P3F, LLC and is one of the inventors of the technology and trade secrets that constitute the core of the business of these companies.

2.      Plaintiff Evan Dornbush is a citizen of Maryland residing at 8805 Ashford Road, Parkville, Maryland 21234. Mr. Dornbush is a co-founder, former majority owner (with Mr. Rigney) and member and former employee of Point3 Security and P3F and is

one of the inventors of the technology and trade secrets that constitute the core of the business of these companies.

3.      Defendant CyberPoint3 Holdings, LLC ("CP3") is a Delaware limited liability company with its principal place of business at 629 5th Street, N.E., Washington, D.C. 20002.  CP3 is owned by Defendant Cyber Capital Partners, LLC.

4.      Defendant Cyber Capital Partners, LLC ("Cyber Capital") is a limited liability company organized under the law of the District of Columbia, with its principal place of business at 629 5th Street, N.E., Washington, D.C. 20002.

5.      Defendant Jason M. Gayl is a citizen of Virginia, residing at 6952 Kyleakin Court, McLean, Virginia 22101-1556.  Mr. Gayl is the president and managing member of both CP3 and Cyber Capital, and the president of the P3 companies.

6.      Defendant Richard Scigaj is a citizen of Virginia, residing at 2690 Mattox Creek Dr., Oakton, Virginia 22124. Mr. Scigaj is the CFO of CP3, Cyber Capital, and the P3 companies.

7.      Defendant Point3 Security, Inc. ("Point3") is a Delaware company with its principal place of business at 629 5th Street, N.E., Washington, D.C. 20002.

8.      Defendant P3F, LLC ("P3F") is a Maryland limited liability company with its principal place of business at 629 5th Street, N.E., Washington, D.C. 20002.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. Section 1331 because this case raises a federal question and because 18 U.S.C. Section 1836 *et seq.* creates a federal cause of action.

10.     This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. Section 1367.

11.     This Court has personal jurisdiction over each of the Defendants by virtue of Maryland's long arm statute.  Defendants have transacted business in the state of Maryland, specifically with Point3 and P3F, which used to be based in Maryland prior to the Stock Purchase Agreement, and Defendants have caused tortious injury to Plaintiff Dornbush in the state of Maryland.  The Stock Purchase Agreement also contains a forum selection and consent to jurisdiction clause which designates Maryland as the forum in which disputes under the agreement's terms are to be litigated.

## ALLEGATIONS COMMON TO ALL COUNTS

12.     Point3 and P3F (collectively, the "P3 companies") were founded in 2014 and 2015, respectively, by Messrs. Rigney and Dornbush to provide talent screening and analytical tools to information security organizations to enhance their workforce. Recognizing the industry's increasingly complex and ever-changing threats, the companies provide game-based challenges that identify and cultivate cybersecurity talent for professional organizations.  Point3's focus is sales and services to private security companies, while P3F is focused on sales and services to governmental agencies.

13.     The companies' primary product is a software product called ESCALATE. ESCALATE, which was designed by Plaintiffs, is a module for training and education for individuals in the intelligence world to train and also evaluate individuals in understanding and preventing cyber-attacks.  Plaintiffs have also developed proprietary educational and training methods that are used in connection with ESCALATE.  The technology and know-

how that constitute ESCALATE and related educational and training methods constitute the trade secrets of the P3 companies.  Plaintiffs also developed a product called JUPITER which makes available a suite of tools for cybersecurity professionals.  Between the formation of the P3 companies and the end of 2021, Plaintiffs operated and grew the businesses, and the companies had as many as 40 employees at their peak in these years.

      A.     <u>Defendant Gayl Touts His Expertise and Investment Connections to Induce Plaintiffs to Sell Majority Interests in the P3 Companies.</u>

      14.     In September 2021, Messrs. Rigney and Dornbush were introduced through a business broker to Defendant Gayl who expressed interest in acquiring Point3 and P3F. Cyber Capital touts itself as a commercialization, venture capital and private equity firm that capitalizes and invests in cybersecurity businesses.  Cyber Capital also touts itself as "management in a box" with executives capable of stepping in and managing existing businesses in the cyber security and other fields.  In his discussions with Plaintiffs prior to closing of the Stock Purchase Agreement and in a September 24, 2021 letter to Suzanne E. Kecmer, Plaintiffs' business broker, Gayl touted Cyber Capital's "portfolio" of companies and investment relationships as a means of convincing Plaintiffs of his credibility and experience in the fields of venture capital and private equity. *See* September 24, 2021 letter attached as Ex. 1. In reality, Cyber Capital did not have a "portfolio" and Gayl misrepresented the nature of his and Cyber Capital's experience in venture capital and private equity transactions.  The only companies in Cyber Capital's "portfolio" are the P3 companies which are the subject of this case, and an entity called Eagle Venture Studio,

which, as described in more detail below, Gayl created on the back of investment funds raised with Plaintiffs' technology.

15.    From the parties' first introduction until the Stock Purchase Agreement was closed on December 31, 2021, Gayl pursued a deal with Plaintiffs whose broad outlines would result in Cyber Capital acquiring majority ownership interests in the P3 companies, acquiring the companies' IP, and hiring Plaintiffs into the P3 companies as employees where they would be paid a salary and locked into employment terms.  Throughout the Fall and early Winter of 2021, Gayl assured Plaintiffs that Cyber Capital would acquire the P3 companies with the intention to grow them to the significant benefit of Plaintiffs. For instance, on September 22, 2021, Gayl told Plaintiffs that Cyber Capital had "immediate capital" and "accredited investors" which would take the companies' business to "the next level."  Gayl further told Plaintiffs that he was "an expert at business management" and that Gayl and his team could provide superior management services which would grow the companies' business.

16.    On or about October 13, 2021, a data room was opened to allow Cyber Capital to review the P3 companies' books and records and conduct due diligence for the anticipated sale transaction.

17.    To convince Plaintiffs he had the requisite financial and managerial expertise to make an acquisition of Point3 and P3F a success, on January 5, 2022 Gayl informed Plaintiffs that he owned a company called "On-Going Operations" ("OGO"), which provides cyber and cloud services to credit unions.  Gayl also informed Plaintiffs that he was in the process of buying both a CIA data sciences company and a nuclear power

systems implementation company. Gayl informed Mr. Rigney specifically that since he owned OGO, OGO would provide services to the Point3 companies at a reduced rate, and that "if OGO's security is good enough for NSA and the CIA it should be good enough for [Plaintiffs]." On information and belief, Mr. Gayl is not the owner of OGO and the statements he made to Plaintiffs about OGO and other acquisitions were false and were made with the intention to deceive Mr. Rigney as to Gayl's experience and trustworthiness.

18.    While some of Gayl's representations to Plaintiffs were made orally, others were made in writing. In the IOI, Gayl claimed that Cyber Capital has been "pre-approved" "by several financing partners" with respect to the investments into the P3 companies following their acquisition, and that Cyber Capital would finance the acquisition and net working capital from "commercial banks." Gayl further claimed that Cyber Capital will "shelter the Sellers" from any personal guarantees related to these "debts." Gayl further represented that Cyber Capital would source Limited Partners from "our professional network of cybersecurity investors" and that it would "invest our own capital" into the P3 companies.

19.    In a December 3, 2021 Letter of Intent, attached as Ex. 2, Gayl continued to reference Cyber CP's private equity and venture capital "portfolio."

20.    In a December 24, 2021 "Confidential" memo Gayl sent to Plaintiffs, Gayl repeated the claim that Cyber Capital had been pre-approved for investment funding to the P3 companies and provided a summary of unnamed investors who had expressed a "high level of interest" in the acquisition. *See* December 24, 2021 memo attached as Ex. 3. Specifically, Gayl touted a "Mid-Atlantic Private Equity Fund" which recently raised an

"additional $100m" and that Cyber Capital has "agreed to basic terms with this group." Gayl also touted a "Washington DC Multi-Family Office" that "has indicated a willingness to write check sizes of $2m to $100m and stated that they were 'very interested' in participating."

21.     Gayl not only told Plaintiffs that he and Cyber Capital would attract significant investment funding to P3, Gayl also assured Plaintiffs that his intent and the intent of Cyber Capital was to grow the P3 companies, to the benefit of Plaintiffs who would still hold minority stakes in the companies and be employed by the companies after the anticipated sale transaction.

22.     Gayl made the statements identified above as a means of inducing Plaintiffs to enter into the Stock Purchase Agreement, but those statements were false at the time Gayl made them and he knew they were false.  In reality, Gayl and Cyber Capital had no "portfolio" of companies into which he had successfully attracted investments.  In reality, Cyber Capital had not been "pre-approved" for investments into P3 and had not "agreed to basic terms" with an investment group, nor had any D.C.-based family office indicated a willingness to write 7-8 figure checks to the P3 companies.  In reality, Gayl and Cyber Capital had no intention of raising capital from third party lenders and investors; instead, Gayl intended to use the P3 companies to draw as much income from the companies as he could to compensate himself and Scigaj to fund other ventures unrelated to P3.

23.     Although from the outset of the parties' discussions Gayl led Plaintiffs to believe that Cyber Capital would be the entity acquiring the P3 companies, on or about December 29, 2021, Mr. Gayl informed Plaintiffs he had formed a new entity, CP3, which

would be the acquiring company.  On information and belief, CP3 is the alter ego of Cyber Capital, is inadequately funded and is controlled wholly by Gayl in his position as President of Cyber Capital.

          B.      The Parties Execute the Stock Purchase Agreement.

        24.      On December 31, 2021, P3F, Point3 and CP3 executed a Stock Purchase Agreement pursuant to which CP3 acquired stock in the companies as follows:

- With respect to Point3, CP3 agreed to acquire 70% of Plaintiffs' collective shares in the company, equal to 1,820,000 of the outstanding 2,600,000 shares in the company;

- With respect to P3F, CP3 entered into a Membership Unit Purchase Agreement under which CP3 agreed to acquire eighty percent (80%) of Plaintiffs' Units in the LLC.

The intellectual property of the P3 companies was also to be assigned to CP3.  In exchange for the transfer of Plaintiffs' Units of P3F, CP3 executed the "P3F Secured Promissory Note" pursuant to which CyberPoint3 agreed to pay Plaintiffs the sum of One Million Dollars ($1,000,000).  In exchange for the shares of stock in Point3, CyberPoint3 executed the "Point3 Secured Promissory Note" pursuant to which CyberPoint3 agreed to pay Plaintiffs Four Million Five Hundred Thousand Dollars ($4,500,000).  CP3's payments under both Promissory Notes were tied to and triggered by the "Finance Plan Completion Date" which was defined in Schedule 2.3 of the Stock Purchase Agreement.  Beginning on the first day of the calendar month immediately following the Finance Plan Completion Date and continuing monthly thereafter for a total period of twelve (12) months), CP3 was

to make monthly payments to Plaintiffs until the purchase price sums were fully paid. Simultaneously with the execution of the Stock Purchase Agreement, Plaintiffs resigned as officers of the P3 companies and became employees of the companies by executing employment agreements. *See* Excerpts from Stock Purchase Agreement attached as Ex. 4.

25.     The Finance Plan Memorandum was not drafted until February 1, 2022, over a month after the deal closed. The document was drafted by Cyber Capital and signed by Defendant Scigaj as "Partner and CFO" of Cyber Capital Partners and CyberPoint3, and was copied to Defendant Gayl, as Managing Partner and CEO of Cyber Capital, and Allison Reardon, a "partner" in "Cyber Capital. The Finance Plan stated that "Cyber Capital, LLC is excited to welcome P3F and Point3 Security to our portfolio! We anticipate a long and fruitful relationship with you and your companies."

26.     The Finance Plan sets forth several "actions we have agreed to take to keep the combined entities in business while still allowing Cyber Capital partners to be compensated for its contribution to improving the long-term state of the business." Among other things, these actions included:

- Payment of an annual salary to each of the Plaintiffs of $250,000, and the possibility of a performance bonus;

- Reimbursement of any company expenses incurred by Plaintiffs;

- Generous salaries to Cyber Capital executives for three management positions at rate of $364k each for Gayl (Corporate Development), Mr. Scigaj (Finance & Administration) and Ms. Reardon (Operating Partner), including bonus plans for these individuals as "cash becomes available;"

- Termination and/or furloughing of a number of employees of Point3 and P3F; and

- Requirement that Point3 and P3F pay the legal and tax costs for the deal closing "on both sides of the transaction."

27. The Finance Plan also promised an "earn out" payment to Plaintiffs of up to $5 million to be paid "no later than 60 days after completion of the earn-out periods."

28. The plan further stated that "[i]f the actions in the plan are not immediately successful in keeping both companies cash-positive, the compensation due to Plaintiffs, Ms. Reardon, Mr. Gayl and Mr. Scigaj will be accrued on a deferred basis at up to 50% of the amount owed." Post-closing, Gayl and Scigaj have tried to use this deferral provision as a basis to withhold compensation to Plaintiffs without justification. On information and belief, Gayl did not accrue his or the other Cyber Capital salaries and paid their salaries in full regardless of the financial conditions of the companies.

29. Following closing of the Stock Purchase Agreement, Gayl installed his own management team at the P3 companies but failed to deliver on his promises of attracting investments to the P3 companies or growing the companies' business. On more than one occasion after closing of the Stock Purchase Agreement, Gayl told Plaintiffs he "cried when he bought us" because the acquisition of the P3 companies gave him "cred" that he had previously lacked in the investment banking and private equity communities. Using that "cred," Gayl began using the closing of the P3 deal as a platform for raising capital for other ventures he was involved in. In one case, Gayl raised $1 million dollars from Breakaway Capital. Although the investment was secured by P3 assets (which was a

violation of the Stock Purchase Agreement), Gayl diverted the money away from P3 and invested it in a new entity called Eagle Venture Studios.  By the middle of 2022, just six months after the deal closed, Gayl had given up all pretense of fundraising for the P3 companies.

30.     Prior to the closing of the transaction, Gayl informed Plaintiffs that he had $5,000,000 of funds lined up from an investor that wanted to invest in cyber security companies like the P3 companies' technology. After the transaction closed, rather than bring that investment money to P3, after closing the Stock Purchase Agreement deal, Gayl indicated that he would use that money to acquire a company he referred to as SCORPION.  In a weekly executive call, Mr. Dornbush asked Gayl why Gayl wouldn't use that investment money for the P3 companies and Gayl became abusive, yelling at Mr. Dornbush that the question was "inappropriate" and "unprofessional."

31.     Plaintiffs themselves tried on several occasions to attract investors for the P3 companies post-closing and were able to identify two potential investors who indicated they were interested in making substantial seven figure investments into the companies.  In some instances, Gayl refused to meet with these investors, and in others, Gayl met with the investors only to tout Eagle Ventures, thus causing the P3 companies to miss out on these funding opportunities.

32.     Gayl not only failed to seek new investment money for the P3 companies, he began to take steps to ensure that the P3 companies would fail to generate sufficient income to grow as Gayl had promised.  On information and belief, Gayl did so with the

hope that the Finance Plan would never reach its completion date, and Gayl and his entities would not have to pay Plaintiffs the $5.5 million the Stock Purchase Agreement required.

33.    Post-closing, Gayl also began to block Plaintiffs' access to the companies' financial information even though they remained as shareholders/members in the entities. Gayl also insisted that all sales efforts be routed through Scigaj, even though Scigaj had no sales experience in the cyber security industry and no experience selling the products and services of the P3 companies.  In breach of his duties as CFO of the P3 companies, Scigaj refused to pursue potentially lucrative sales opportunities for the P3 companies, including opportunities with BlackHat MENA, a "John K." Navy proposal, US Cyber Games and Saudi's National Learning Platform.  Concerned that this failure to pursue leads would harm the companies and further exacerbate capitalization issues the companies faced, Mr. Dornbush pursued opportunities on his own, and was reprimanded by Gayl for doing so.

34.    Throughout 2022, the financial condition at the P3 companies deteriorated. Prior to the closing of the Stock Purchase Agreement, Mr. Dornbush had used a company credit card to pay for company expenses on which Mr. Dornbush was jointly and severally liable.  After closing, Gayl, Scigaj and/or their companies refused to pay the legitimatye business expenses Mr. Dornbush incurred on the credit card, harming Mr. Dornbush's credit and exposing him to potential collection actions.

35.    Plaintiffs repeatedly asked Gayl for the financial statements of the P3 companies.  When Mr. Rigney asked for clarification regarding entries for officer loans on the companies' books during one meeting, Scigaj refused to answer that question, even though one of the loans led to $2,000,000 disappearing from the companies' financial

statements.   Plaintiffs later learn that Gayl purchased a $2,000,000 house in McLean
Virginia around this time.

36.     Notwithstanding Gayl's best efforts, by at least Fall, 2022, the terms of the
Finance Plan were complete, and on October 27, 2022, Cyber Capital confirmed this fact
in an email to Plaintiffs, stating that the "financial plan is complete."  *See* October 27, 2022
email attached as Ex. 5.  Despite this admission and repeated requests from Plaintiff,
Defendants have refused to begin making payments on the promissory notes, the first
payment of which was due by November 26, 2022.  In short, and despite demands from
Plaintiff, in nearly one and one half years after closing of the Stock Purchase Agreement,
Gayl, CP3 and Cyber Capital have made no payments to Plaintiffs for the majority
ownership stakes in the P3 companies which included ownership of the companies' IP.

37.     With respect to their employment by the P3 companies now under Gayl's
management, Plaintiffs were paid sporadically, from P3 company accounts as well as
Cyber Capital accounts and sometimes not at all.  Gayl and Scigaj determined how and
when Plaintiffs received compensation from the companies, and the companies often failed
to meet payroll post-closing.

38.     On or about January 27, 2023, Gayl and Scigaj terminated Plaintiffs'
employment without cause, in violation of their employment agreements.  At the time of
their wrongful termination, the P3 companies had underpaid Plaintiffs by over $200,000.

39.     After Plaintiff's termination, Defendants have wrongfully blocked Plaintiffs
from access to the company servers on which the ESCALATE software is housed.
Although terminated, Plaintiffs remain minority owns of the P3 businesses and have

attempted to secure new business for the companies.  Defendants have refused to allow Plaintiffs' access to the servers, thereby causing continuing harm to the P3 companies.

40.    On or about May 19, 2023, after numerous requests by Plaintiffs to Defendants to honor the terms of the Stock Purchase Agreement, Defendants sent a notice to Plaintiffs purporting to nullify the Stock Purchase Agreement, nearly one and one half years after closing of the deal.  Defendants have tried to justify their attempted nullification by arguing that the Finance Plan remains incomplete, but this contention is plainly belied by Defendants' admissions to the contrary and the terms of the Stock Purchase Agreement do not allow Defendants to nullify the agreement.  Tellingly, Defendants' notice comes at a time when the Defendants have driven the P3 companies to the verge of insolvency.  The P3 companies, under Defendants' ownership and management, are several millions of dollars in debt, have no discernible sales prospects and have lost all momentum in the cyber security training market.  Having capitalized for their own profit on the technology and goodwill of the P3 companies, and stripped those companies of their value, Defendants want to hand back to the Plaintiffs the empty husk of those businesses in a blatant effort to escape liability their very clear for their obligations under the terms of the Stock Purchase Agreement.

### COUNT I – BREACH OF STOCK PURCHASE AGREEMENT AND PROMISSORY NOTES – DECLARATORY RELIEF, SPECIFIC PERFORMANCE AND DAMAGES
### (CP3, CYBER CAPITAL AND GAYL)

41.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

42.    Defendant CyberPoint3 entered into the December 31, 2021 Stock Purchase Agreement with Messrs. Rigney and Dornbush pursuant to which CP3 agreed to make payments of $1 Million to Plaintiffs in connection with the transfer of certain membership interests in P3F, and payments of $4.5 million to Plaintiffs in connection with the purchase of 70% of the outstanding shares of Point3.  Those payments were to be made in installments pursuant to Promissory Notes dated December 31, 2021, with the first payments made within 30 days of completion of completion of the Finance Plan, which by Defendants' admission occurred on October 27, 2022.

43.    Defendants have refused to begin payment of the sales price for the companies to Plaintiffs.  Accordingly, Defendants are in breach of the Stock Purchase Agreement.

WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court: 1) find and declare that Defendants are obligated to make payments under the Promissory Notes beginning on November 26, 2022, and order Defendants to make such payments; 2) order that Defendants specifically perform their obligations under the terms of the Stock Purchase Agreement; 3) award damages to be proven at trial, but in

amount not less than Seventy Five Thousand Dollars ($75,000); and 4) award attorneys fees' costs and other such relief as the Court finds in the interests of justice.

### COUNT II – INTENTIONAL MISREPRESENTATION
### (CP3, CYBER CAPITAL, JASON GAYL)

44.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

45.    Defendant Gayl, and through Gayl Defendants CP3 and Cyber Capital, made intentional misrepresentations of fact to Plaintiffs during negotiations leading to the Stock Purchase Agreement.  These misrepresentations included the following:

- Statements made by Gayl as to his prior experience with respect to raising capital for other companies;

- Statements made by Gayl relating to his intention to raise capital for Point3 and P3F when Gayl had no such intention of doing so;

- Statements made by Gayl as to financing and/or investments he had lined up for the companies in advance of closing of the Stock Purchase Agreement;

- Statements made by Gayl as to his intention to acquire Point3 and P3F and run them in a manner to maximize their profitability, when instead Gayl's intention was to cannibalize the companies, and use them to attract investors into other entities he owns or controls, including CP3, Cyber Capital and Eagle; and

- Statements that Defendants intended to honor the payment terms of the Stock Purchase Agreement, when in fact Defendants had no such intention, and their goal was to misappropriate the P3 companies' IP and resources.

46.      Gayl made these misrepresentations to Plaintiffs with malice and for the purpose of defrauding Plaintiffs and inducing Plaintiffs to enter into the Stock Purchase Agreement, and transfer their majority ownership of the P3 companies and the companies' software to Defendants for no money.  Defendants also made these misrepresentations with the goal of using the P3 acquisition to bolster their own "cred" in the investment banking and private equity community and raise capital for companies owned and/or operated by Gayl.  Defendants' recent attempts to "nullify" the Stock Purchase Agreement do not alter these facts as Defendants' actions have stripped the P3 companies of value, and Defendants were only able to take such actions because of the misrepresentations Defendants made to Plaintiffs.

47.      Plaintiffs justifiably relied upon Gayl's misrepresentations.

48.      Plaintiffs have suffered harm as a result of Defendants' misrepresentations.

WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court award compensatory damages in an amount to be proven at trial, but in amount not less than Seventy Five Thousand Dollars ($75,000), punitive damages in an amount to be determined at trial, attorneys' fees and costs and other such relief as the Court finds in the interests of justice.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (GAYL AND SCIGAJ)

49.      Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

50.      Defendants Gayl and Scigaj owed fiduciary duties of care to the P3 companies as officers of those companies.  Specifically, Gayl as President, and Scigaj as

CFO, were required to exercise reasonable care and skill in the performance of their responsibilities as officers, as well as the duties of loyalty, good faith and candid disclosure.

51.     Gayl and Scigaj breached those duties by failing to pursue funding opportunities for the P3 companies, and by failing to pursue sales opportunities including those opportunities described above.  Defendants' breach of their fiduciary duties to the P3 companies has resulted in harm to Plaintiffs.  These Defendants are continuing to breach their fiduciary duties by continuing to fail to pursue sales and funding opportunities for the P3 companies after Plaintiffs' termination.

52.     Both prior to and after their terminations, Plaintiffs made repeated demands on Defendants to either pursue these opportunities for the P3 companies or allow Plaintiffs to pursue such opportunities.  Defendants have rejected these demands and blocked Plaintiffs' access to the third party servers where the software resides.  Any additional demands upon these Defendants to pursue funding and sales on behalf of the P3 companies would be futile.  Defendants' recent attempts to "nullify" the Stock Purchase Agreement do not alter these facts as Defendants' actions have stripped the P3 companies of value, and Defendants were only able to take such actions because of the misrepresentations Defendants made to Plaintiffs.  Indeed, Defendants' nullification notice underscores the futility of any additional demand.

WHEREFORE, Plaintiffs, derivatively on behalf of the P3 companies, request that this Court enter against Defendants Gayl and Scigaj judgment on behalf of Point3 Security, Inc. and P3F, LLC in an amount to be determined at trial, but no less than $75,000, plus attorneys' fee, costs and other such relief as the Court finds in the interests of justice.

## COUNT IV – DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836(b)(1)
### (CP3, CYBER CAPITAL, JASON GAYL)

53. Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

54. Defendants' conduct violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*

55. Plaintiffs possessed trade secrets as described further above, including but not limited to the ESCALATE and JUPITER software, and proprietary educational and training methods that Plaintiffs have developed in the use of this software.

56. Plaintiff's trade secrets have independent economic value.

57. At all relevant times, Plaintiff took reasonable measures to keep its trade secrets confidential and secret.

58. Defendants misappropriated Plaintiff's trade secrets as is defined in 18 U.S.C. § 1839(5)(B) in two ways. First, by breaching the Stock Purchase Agreement and defrauding Plaintiffs in connection with that agreement, Defendants have unlawfully gained control over Plaintiffs' trade secrets and have misappropriated them in their businesses. Secondly, Defendants unlawfully blocked Plaintiffs' access to the software and related technology by removing Plaintiffs' access to the third party servers which host the software. Defendants' recent attempts to "nullify" the Stock Purchase Agreement do not alter these facts as Defendants' misuse caused damage to the P3 companies before Defendants' nullification notice. Plaintiffs are investigating whether and to what extent Defendants' misappropriation may be ongoing.

59.    The trade secrets which Defendants misappropriated were intended for use and/or were in fact used in interstate and foreign commerce.

60.    As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiffs' trade secrets in violation of the DTSA, Plaintiffs have been damaged in an amount to be determined at trial.

61.    As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiffs' trade secrets in violation of the DTSA, Defendants have been unjustly enriched.

62.    As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiffs' trade secrets, Plaintiffs are suffering and will continue to suffer irreparable harm if Defendants' misappropriation and use of Plaintiffs' trade secrets is not enjoined.

63.    The misappropriation of Plaintiffs' trade secrets was done in bad faith and was willful and malicious.

WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court 1) permanently enjoin Defendants from any further use of Plaintiffs' trade secrets; 2) award compensatory damages in an amount to be proven at trial, but in amount not less than Seventy Five Thousand Dollars ($75,000; 3) award treble damages in an amount to be determined at trial; 4) award attorneys fees' and costs and 5) award other such relief as the Court finds in the interests of justice.

## COUNT V – VIOLATION OF MARYLAND UNIFORM TRADE SECRET ACT
## (CP3, CYBER CAPITAL, JASON GAYL)

64.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

65.    Defendants' conduct violated Maryland's Uniform Trade Secrets Act ("UTSA"), Md. Comm. Code section 11-1201 *et seq.*

66.    Plaintiff possessed trade secrets as described further above, including but not limited to its datasets, software tools, technical knowledge and customer information.

67.    Plaintiff's trade secrets have independent economic value.

68.    At all relevant times, Plaintiff took reasonable measures to keep its trade secrets confidential and secret.

69.    Defendants misappropriated Plaintiff's trade secrets as is defined in Md. Comm. Code section 11-1201 in two ways.  First, by breaching the Stock Purchase Agreement and defrauding Plaintiffs in connection with that agreement, Defendants have unlawfully gained control over Plaintiffs' trade secrets and have misappropriated them in their businesses.  Secondly, Defendants have unlawfully blocked Plaintiffs' access to the software and related technology by removing Plaintiffs' access to the third party serves which host the software.  Defendants' recent attempts to "nullify" the Stock Purchase Agreement do not alter these facts as Defendants' misuse caused damage to the P3 companies before Defendants' nullification notice.  Plaintiffs are investigating whether and to what extent Defendants' misappropriation may be ongoing.

70.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiffs' trade secrets in violation of the UTSA, Plaintiff has been damaged in an amount to be determined at trial.

71.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiffs' trade secrets in violation of the UTSA, Defendants have been unjustly enriched.

72.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiff's trade secrets, Plaintiffs are suffering and will continue to suffer irreparable harm if Defendants' misappropriation and use of Plaintiffs' trade secrets is not enjoined. The misappropriation of Plaintiffs' trade secrets was done in bad faith and was willful and malicious.

WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court 1) permanently enjoin Defendants from any further use of Plaintiffs' trade secrets; 2) award compensatory damages in an amount to be proven at trial, but in amount not less than Seventy Five Thousand Dollars ($75,000); 3) award treble damages in an amount to be determined at trial; 4) award attorneys fees' and costs and 5) award other such relief as the Court finds in the interests of justice.

### COUNT VI – BREACH OF MARYLAND WAGE PAYMENT AND COLLECTION ACT (ALL DEFENDANTS)

73.     Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

74.     Following closing of the Stock Purchase Agreement, Plaintiffs became employees of Point3 and P3F and their employment was subject to the Maryland Wage Payment & Collection Law (the "MWPCL").  At all relevant times, Defendants Gayl and Scigaj have exercised control over the financial and other affairs of Point3 and P3F to such an extent that they have caused these entities to fail to pay Plaintiffs compensation and bonuses as required under the terms of their employment.

75.     The compensation and bonuses promised to Plaintiff constitute "wages" under the MWPCL.  Defendants have violated the MWPCL by failing to pay Plaintiffs in accordance with the employment agreements. There is no bona fide dispute that such wages are owed to Plaintiffs.

76.     Additionally, Defendants have caused Plaintiffs to incur charges for business expenses that should have been borne by Point3 and P3F, and for which Plaintiffs have not been reimbursed.  These expenses include but are not limited to credit card charges, interest, and fees Mr. Dornbush has incurred because of Defendants failure pay those expenses as requested.

WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court award compensatory damages in an amount to be proven at trial, but in amount not less than Seventy Five Thousand Dollars ($75,000), treble damages in an amount to be determined at trial, attorneys' fees and costs and other such relief as the Court finds in the interests of justice.

## COUNT VII – WRONGFUL TERMINATION
## (ALL DEFENDANTS)

77.    Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

78.    Plaintiffs' employment agreements only allow the P3 companies to terminate Plaintiffs for cause, incapacitation or death.  On or about January 27, 2023, the P3 companies, through Gayl and Scigaj, terminated Plaintiffs without cause.   On information and belief, Plaintiffs were terminated in retaliation for demanding that Defendants honor their payment obligations under the Stock Purchase Agreement, provide information about the companies, finances, and pursue sale leads.

79.    Plaintiffs' termination was wrongful, and the wages and other compensation Plaintiffs would have received from their continued employment constitute wages under the constitute "wages" under the MWPCL.  There is no bona fide dispute that such wages are owed to Plaintiffs.

80.    WHEREFORE, Plaintiffs John Rigney and Evan Dornbush respectfully request that this Court award compensatory damages in an amount to be proven at trial, but in amount not less than Seventy Five Thousand Dollars ($75,000), treble damages in an amount to be determined at trial, attorneys' fees and costs and other such relief as the Court finds in the interests of justice.

*/s/  George F. Ritchie*

George F. Ritchie (Fed. Bar No. 22408)
GORDON FEINBLATT LLC
1001 Fleet Street, Suite 700
Baltimore, MD  21202
gritchie@gfrlaw.com
Tel:    410-576-4131
Fax:    410-576-4269

*Attorneys for Plaintiffs John Rigney*
*and Evan Dornbush*