IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN RIGNEY, et al.,                        *

    Plaintiffs,                              *

v.                                          *        Civil Action No. GLR-23-1420

CYBERPOINT3 HOLDINGS, LLC, et               *
al.,
                                   *

    Defendants.                              *
                                   *
                               ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Cyberpoint3 Holdings, LLC,

Cyber Capital Partners, LLC, Point3 Security, Inc., P3F, LLC, Jason M. Gayl, and Richard

Scigaj's (collectively, "Defendants") Motion to Partially Dismiss the Amended Complaint

(ECF No. 44). The Motion is ripe for disposition, and no hearing is necessary. See Local

Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will grant the Motion

in part and deny it in part.

### I.    BACKGROUND

#### A.    Factual Background[1]

Plaintiffs John Rigney and Evan Dornbush (together, "Plaintiffs") co-founded

Defendants Point3 Security, Inc. and P3F, LLC (together, the "P3 Companies")—two

companies that "provide talent screening and analytical tools" to private and governmental

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint (ECF No. 41) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

"information security organizations"—in 2014 and 2015, respectively. (Am. Compl. ¶ 12, ECF No. 41). Plaintiffs also designed the software, educational materials, and training methods that serve as the core of the P3 Companies' business. (Id. ¶ 13). Together, Plaintiffs operated and grew the P3 Companies until late 2021. (Id.).

In September 2021, Plaintiffs met Defendant Jason Gayl. (Id. ¶ 14). Gayl is the president and a managing member of Defendant Cyber Capital Partners, LLC ("Cyber Capital"), a "commercialization, venture capital and private equity firm that capitalizes and invests in cybersecurity businesses." (Id. ¶¶ 5, 14). Gayl expressed an interest in Cyber Capital acquiring the P3 Companies, and on September 24, 2021, he sent Plaintiffs an Indication of Interest letter outlining the proposed acquisition. (Id. ¶ 14; see Sep. 24, 2021 Indication of Interest Letter ["Sep. 24, 2021 IOI] at 1–8, ECF No. 41-1).[2] Through this and other communications, Gayl informed Plaintiffs of Cyber Capital's "'portfolio' of companies and investment relationships," its experience in the venture capital and private equity fields, its access to funding for the P3 Companies, and its intention to grow the P3 Companies "to the significant benefit of the Plaintiffs." (Am. Compl. ¶¶ 14–15; Sep. 24, 2021 IOI at 2, 9–15).

In October 2021, Plaintiffs gave Cyber Capital access to the P3 Companies' books and records to "conduct due diligence for the anticipated sale transaction." (Am. Compl. ¶ 16). Gayl later sent two Letters of Intent to acquire the P3 Companies and their intellectual property, one on December 3, 2021, and another on December 24, 2021. (Id.

---

[2] Unless otherwise noted, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

¶¶ 19, 21; see Dec. 3, 2021 Letter of Intent ["Dec. 3, 2021 LOI"] at 1, ECF No. 41-2; Dec. 24, 2021 Letter of Intent ["Dec. 24, 2021 LOI"] at 1, ECF No. 41-4). Gayl also sent Plaintiffs an email on December 21, 2021, explaining that "by March 31, 2022, [Cyber Capital] will have syndicated $4,000,000 investment into Point3 Security, Inc.'s yet to be formed subsidiaries," but, according to Plaintiffs, that never happened. (Am. Compl. ¶ 20; see Dec. 21, 2021 Email at 1, ECF No. 41-3). Through these and other communications, Gayl represented to Plaintiffs that "Cyber Capital ha[d] been 'pre-approved' 'by several financing partners'" to invest in the P3 Companies, "that Cyber Capital would finance the acquisition and net working capital from 'commercial banks,'" that Cyber Capital would "'shelter [Plaintiffs]' from any personal guarantees related to these 'debts,'" and that Cyber Capital would invest its own capital into the P3 Companies. (Am. Compl. ¶ 18; Sep. 24, 2021 IOI at 5; Dec. 3, 2021 LOI at 8).

According to Plaintiffs, Gayl misrepresented his and Cyber Capital's level of experience, the extent of Cyber Capital's "portfolio," and the amount and sources of funding available to Cyber Capital. (Am. Compl. ¶ 14). Plaintiffs allege that Cyber Capital's portfolio consists only of the P3 Companies and one other company that Gayl created after the acquisition, using investment funds raised with the technology that Plaintiffs invented. (Id.). Plaintiffs further allege that Cyber Capital did not have access to funding, as Gayl said it did, and did not invest in the P3 Companies after the acquisition, as Gayl said it would. (Id.). Plaintiffs assert that Gayl made false statements regarding his and Cyber Capital's experience and funding to induce Plaintiffs into agreeing to the acquisition. (Id. ¶ 23).

On December 29, 2021, two days before the scheduled execution of the acquisition agreement, Gayl told Plaintiffs that Defendant CyberPoint3 Holdings, LLC, ("CyberPoint3"), a new company that Gayl had formed, would acquire the P3 Companies instead of Cyber Capital. (Id. ¶ 24). According to Plaintiffs, CyberPoint3 is the "alter ego of Cyber Capital, is inadequately funded[,] and is controlled wholly by Gayl in his position as President of Cyber Capital." (Id.).

On December 31, 2021, the parties executed a Stock Purchase Agreement ("SPA") by which CyberPoint3 would acquire majority ownership interests in the P3 Companies in exchange for $5,500,000—$1,000,000 for the P3F shares and $4,500,000 for the Point3 Security shares. (Id. ¶ 15, 25; see SPA at 5, ECF No. 41-5). CyberPoint3 then executed two secured promissory notes, one reflecting the $1,000,000 owed for the P3F shares and one reflecting the $4,500,000 owed for the Point3 Security shares. (Am. Compl. ¶ 25).

The SPA required, among other things, that Plaintiffs transfer the P3 Companies' intellectual property to CyberPoint3 and that Plaintiffs sign employment agreements converting them from officers to employees of the P3 Companies. (Id.; SPA at 6, 11). The SPA also directed the parties to create a Finance Plan outlining "certain operational and financial actions and milestones" that Plaintiffs had to complete or meet "before certain elements of the transaction [could] be consummated, including payment of the Purchase Price." (SPA at 6). CyberPoint3's payments under the two promissory notes, therefore, were "tied to and triggered by" the completion of the Finance Plan such that, starting the month after the completion date, CyberPoint3 would make monthly payments to Plaintiffs until the promissory notes were paid in full. (Am. Compl. ¶ 25).

On February 1, 2022, the parties created the Finance Plan. (Id. ¶ 26; SPA at 37). The Finance Plan required that Plaintiffs receive an annual salary of $250,000 with potential bonuses "as cash becomes available"; that Gayl, Defendant Richard Scigaj, and Alison Reardon (all managing partners of Cyber Capital) receive an annual salary of $364,000 with potential bonuses "as cash becomes available"; that several employees at the P3 Companies be terminated, furloughed, or kept on "subject to availability of working capital"; and that the P3 Companies cover the legal and tax costs associated with the closing "on both sides of the transaction." (Am. Compl. ¶¶ 26–27; SPA at 37–39).[3] The Finance Plan further provided that, if the above actions "are not immediately successful in keeping [the P3 Companies] cash-positive, the compensation due to Plaintiffs . . . , [Allison] Reardon, [Jason] Gayl, and [Richard] Scigaj will be accrued on a deferred basis at up to 50% the amount owed" and "repaid as soon as sufficient free cash flow becomes available." (Am. Compl. ¶ 29; SPA at 39).

Plaintiffs state that after the acquisition, "Gayl, Scigaj and/or their companies refused to pay the legitimate business expenses Mr. Dornbush incurred on the [company] credit card" for which Dornbush was jointly and severally liable. (Am. Compl. ¶ 36). Plaintiffs further allege that as employees of the P3 Companies, they were paid "sporadically . . . and sometimes not at all." (Id. ¶ 39). Even so, according to Plaintiffs, the

---

[3] Plaintiffs also allege in the Amended Complaint that the Finance Plan required that Plaintiffs be reimbursed for any company expenses they incurred, (Am. Compl. ¶ 27, ECF No. 41), but the Finance Plan contains no such language, (see SPA at 37–42, ECF No. 41-5). This Court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)).

Finance Plan was completed at least by October 27, 2022, as confirmed in an email from Cameron Watts, the Executive Director of Venture Development at Cyber Capital and the person to whom Plaintiffs reported while employed at the P3 Companies. (Id. ¶¶ 30, 38; Oct. 27, 2022 Email at 1, 3, ECF No. 41-6). Plaintiffs state that Cyber Capital has made no payments on the promissory notes despite the alleged completion of the Finance Plan. (Am. Compl. ¶ 39).

Plaintiffs also allege that Gayl "failed to deliver on his promises of attracting investments to the P3 companies or growing the companies' business" after the acquisition. (Id. ¶ 30). Specifically, Plaintiffs allege that before executing the SPA, Gayl told them that he had "$5,000,000 of funds lined up from an investor who wanted to invest in cyber security companies . . . ." (Id. ¶ 32). But rather than invest those funds into the P3 Companies after the acquisition, Gayl said he planned to use those funds to acquire another company. (Id.). When Plaintiffs asked why Gayl did not intend to invest that money into the P3 Companies, Gayl "became abusive, yelling at Mr. Dornbush that the question was 'inappropriate' and 'unprofessional.'" (Id.). Additionally, Plaintiffs state that after the acquisition, Gayl raised capital using the P3 Companies' assets and then diverted that capital away from the P3 Companies and into a new entity called Eagle Venture Studios. (Id. ¶ 31). Plaintiffs further allege that when they found potential investors for the P3 Companies, Gayl refused to meet with the investors or, in some instances, met with the investors to discuss Eagle Venture Studios, not the P3 Companies. (Id. ¶ 33). According to Plaintiffs, by mid-2022, "Gayl had given up all pretense of fundraising for the P3 [C]ompanies." (Id. ¶ 31).

Alongside Gayl's alleged failure to fundraise and invest in the P3 Companies, Plaintiffs state that Gayl "t[ook] steps to ensure that the P3 [C]ompanies would fail to generate sufficient income to grow as Gayl had promised." (Id. ¶ 34). Plaintiffs allege that Gayl took these steps "with the hope that the Finance Plan would never reach its completion date," thus avoiding having to pay Plaintiffs the $5,500,000 purchase price. (Id.).

Plaintiffs further allege that after the acquisition, Gayl blocked Plaintiffs' access to the P3 Companies' financial information and that Scigaj—the Chief Financial Officer ("CFO") of the P3 Companies—"refused to pursue potentially lucrative sales opportunities for the P3 Companies . . . ." (Id. ¶ 35). Plaintiffs tried pursuing opportunities for the P3 Companies on their own, but Gayl allegedly reprimanded them for doing so. (Id.).

In January 2023, Gayl and Scigaj allegedly "terminated Plaintiffs' employment without cause, in violation of their employment agreements." (Id. ¶ 40). Plaintiffs state that the P3 Companies "underpaid [them] by over $200,000" and that, following their termination, "Defendants have wrongfully blocked Plaintiffs from access to the company servers on which the [software that Plaintiffs invented] is housed." (Id. ¶¶ 40–41). Plaintiffs allege that as minority owners of the P3 Companies, they have tried to secure new business for the P3 Companies, but Defendants continue to block Plaintiffs' access to the servers. (Id. ¶ 41).

Plaintiffs allege that they made "numerous requests . . . to Defendants to honor the terms of the [SPA] . . . ." (Id. ¶ 42). Instead of doing so, Defendants sent a letter to Plaintiffs in May 2023 that purported to nullify the SPA because Defendants believe the Finance Plan remains incomplete. (Id.). Plaintiffs allege that, after "driv[ing] the P3 [C]ompanies

7

to the verge of insolvency" and to the point where they have "no discernible sales prospects and have lost all momentum in the cyber security training market," Defendants seek to avoid their obligations under the SPA by returning what is left of the P3 Companies back to Plaintiffs. (Id.).

**B.      Procedural History**

Plaintiffs filed a Complaint in this Court on May 26, 2023. (ECF No. 1). Defendants filed a Motion to Dismiss on September 30, 2024. (ECF No. 40). Plaintiffs filed an Amended Complaint on October 14, 2024, (ECF No. 41), rendering the Motion to Dismiss moot, (ECF No. 49). In the Amended Complaint, Plaintiffs allege breach of contract (Count I); intentional misrepresentation (Count II); breach of fiduciary duties (Count III); violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832, et seq., (Count IV); violations of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. L. §§ 11-201, et seq., (Count V); violations of the Maryland Wage Payment and Collections Law ("MWPCL"), Md. Code Ann., Lab. & Emp. §§ 3-501, et seq., (Count VI); and wrongful termination (Count VII). (Am. Compl. ¶¶ 43–85). Defendants filed the instant Motion to Dismiss on November 12, 2024. (ECF No. 44). Plaintiffs filed an Opposition on December 6, 2024, (ECF No. 47), and Defendants filed a Reply on December 20, 2024, (ECF No. 48).

## II.      DISCUSSION

**A.      Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.    Analysis**

Defendants argue that the Court should dismiss or limit to money damages Plaintiffs' breach of contract claim; dismiss the intentional misrepresentation, breach of fiduciary duty, DTSA, and MUTSA claims for failure to state a claim; and dismiss the MWPCL and wrongful termination claims as to Gayl, Scigaj, CyberPoint3, and Cyber Capital. (Defs.' Mot. Partially Dismiss Pls.' Am. Compl. ["Mot. Dismiss"] at 3–4, ECF No. 44-1). For the reasons stated below, the Court will partially dismiss Plaintiffs' intentional misrepresentation and MWPCL claims and will dismiss Plaintiffs' breach of fiduciary duty and wrongful termination claims.

**1.    Count I – Breach of Contract**

**a.    Full Dismissal**

In Count I of the Amended Complaint, Plaintiffs allege CyberPoint3, Cyber Capital, and Gayl breached the SPA. (Am. Compl. ¶¶ 43–45). To state a claim for breach of contract under Maryland law,[4] the plaintiff must allege the existence of a contractual obligation, a breach of that obligation, and damages. Allegis Grp., Inc. v. Bero, 689 F.Supp.3d 81, 116

---

[4] The parties apply Maryland law to all state law claims without dispute. (See Defs.' Mot. Partially Dismiss Pls.' Compl. ["Mot. Dismiss"] at 9–21, ECF No. 44-1; Pls.' Opp'n Defs.' Partial Mot. Dismiss ["Opp'n"] at 4–26, ECF No. 47; Defs.' Reply Supp. Mot. Partially Dismiss Pls.' Am. Compl. ["Reply"] at 2–5, ECF No. 48). The Court, therefore, will apply Maryland law as well. See Timilon Corp. v. Empowerment Just. Ctr. Corp., 738 F.Supp.3d 669, 684 (D.Md. 2024) (applying forum state's laws where the parties neither address nor dispute choice-of-law (citations omitted)); Legends Title, LLC v. Cap. One, Nat'l Ass'n, 659 F.Supp.3d 637, 650 n.4 (D.Md. 2023) (declining "to raise, sua sponte, and decide, the choice of law issue given the parties' uncontested election to employ Maryland law in support of their respective arguments").

(D.Md. 2023), aff'd, No. 23-2023, 2025 WL 2141298 (4th Cir. July 29, 2025). Further, if the contract contains any conditions precedent—facts that must exist or occur before the contractual obligation arises—the plaintiff "must allege generally that all conditions precedent have occurred or been performed." Fed.R.Civ.P. 9(c); see also Bero, 689 F.Supp.3d at 137–38.

Here, Plaintiffs adequately allege all elements to state a breach of contract claim. Specifically, Plaintiffs allege that the parties executed a contract—the SPA—under which CyberPoint3 is obligated to pay Plaintiffs $5,500,000 in exchange for shares in Point3 Security and P3F. (Am. Compl. ¶ 44). Plaintiffs state that the SPA required CyberPoint3 to begin making monthly payments to Plaintiffs one month after the completion of the Finance Plan and that the Finance Plan was completed on October 27, 2022. (Id. ¶¶ 39, 44). Plaintiffs allege that CyberPoint3, Cyber Capital, and Gayl have breached the SPA by failing to make any payments after the completion of the Finance Plan. (Id. ¶ 45). Finally, Plaintiffs allege that they have suffered harm due to this breach in the form of non-payment of the $5,500,000 purchase price. (Id. ¶ 39; Pls.' Opp'n Defs.' Partial Mot. Dismiss ["Opp'n"] at 7, ECF No. 47).

Defendants argue that the Finance Plan was never completed and that, as a result, "the SPA was never consummated," and there is no binding agreement. (Mot. Dismiss at 9). In other words, Defendants contend that the condition precedent was not met.[5] Their argument centers on an interpretation of Watts' October 27, 2022 email, in which he wrote:

---

[5] Neither party refers to the completion of the Finance Plan as a condition precedent. (See generally Mot. Dismiss; Opp'n; Reply). Based on the unambiguous language of the

> I heard from you [(Rigney)] and confirmed by [Scigaj] and
> team:
> -   "proposal library' transitioned
> -   the financial plan is complete
> -   new catalog was delivered. It sounds like Charlie wanted
>     more transition in the form of SME support: which I'm sure
>     we can work out.
> AGREED

(Oct. 27, 2022 Email at 1). Defendants argue that the absence of "AGREED" typed under

the line "the financial plan is complete" shows that Watts did not actually agree with that

statement. (Mot. Dismiss at 9). Defendants also argue that Plaintiffs fail to allege sufficient

facts demonstrating Watts' authority to "bind any Defendant" by confirming the

completion of the Finance Plan. (Id.).

Defendants' arguments fail at this stage of the proceedings. Plaintiffs need only

"allege generally that all conditions precedent have occurred or been performed,"

Fed.R.Civ.P. 9(c) (emphasis added), and they do so in the Amended Complaint: "by at

least Fall, 2022, the terms of the Finance Plan were complete, and on October 27, 2022,

Cyber Capital, through[] Watts, confirmed this fact in an email to Plaintiffs," (Am. Compl.

¶ 38). If a party "den[ies] that a condition precedent has occurred or been performed," on

the other hand, they "must do so with particularity." Fed.R.Civ.P. 9(c). Defendants dispute

---

SPA, however, the Court finds that it constitutes a condition precedent because
Defendants' obligation to pay Plaintiffs was subject to the completion of the Finance Plan.
(See SPA at 6 (stating that the Finance Plan must be completed "before certain elements
of the transaction can be consummated, including payment of the Purchase Price")); see
also Bero, 689 F.Supp.3d at 138 (stating that "whether a provision in a contract constitutes
a condition precedent is a question of 'construction dependent on the intent of the parties
to be gathered from the words they have employed'" (quoting Miller v. Bristol-Myers
Squibb Co., 121 F.Supp.2d 831, 840 (D.Md. 2000))).

the sufficiency of Watts' email, but they do not state with particularity the ways in which the Finance Plan remains incomplete. (See Mot. Dismiss at 9–10; Defs.' Reply Supp. Mot. Partially Dismiss Pls.' Am. Compl. ["Reply"] at 1–2, ECF No. 48).

Moreover, the Court must draw all reasonable inferences in favor of Plaintiffs, see Doriety for Est. of Crenshaw v. Sletten, 109 F.4th 670, 679 (4th Cir. 2024), and it is not unreasonable to read "AGREED" in the above email excerpt as referring to all the bullet points above it, including the one concerning the completion of the Finance Plan, (Oct. 27, 2022 Email at 1). To the extent that Defendants dispute Plaintiffs' interpretation of Watts' email and Watts' authority to confirm the completion of the Finance Plan (or pass along Scigaj's confirmation, as Watts appears to do in the email, (see Oct. 27, 2022 Email at 1)), the Court cannot resolve such factual disputes at this stage of the proceedings, see Sletten, 109 F.4th at 679 (noting that "a court is not permitted at [the Rule 12(b)(6)] stage of the proceedings to 'resolve contests surrounding the facts'" (quoting Megaro v. McCollum, 66 F.4th 151, 157 (4th Cir. 2023))). The Court, therefore, will not dismiss Count I of the Complaint for failure to state a claim.

### b.    Partial Dismissal

As an alternative argument, Defendants contend that the Court should limit the potential relief in Count I to monetary damages and dismiss Plaintiffs' requests for a declaratory judgment and specific performance. (Mot. Dismiss at 10; see Am. Compl. at 17–18). Plaintiffs contend that all three forms of relief are appropriate in this case. (Opp'n at 8–10). For the reasons set forth below, the Court declines to dismiss Plaintiffs' requests for a declaratory judgment and specific performance at this time.

13

First, as to Plaintiffs' request for declaratory relief, the Maryland Declaratory Judgment Act allows a party to a contract to "have determined any question of construction or validity arising under the [contract] . . . and obtain a declaration of rights, status, or other legal relations under it." Md. Code Ann., Cts. & Jud. Proc. § 3-406. "[D]ismissal of a declaratory judgment action without declaring the rights of the parties rarely is appropriate," but it may be proper when "a declaratory judgment is not an available or appropriate type of remedy." Butz v. Pulte Home Corp., No. PX-16-1508, 2017 WL 679226, at *3 (D.Md. Feb. 21, 2017). To determine whether a declaratory judgment is an appropriate remedy, "the Court must consider whether declaratory relief would 'serve a useful purpose in clarifying and settling the legal relations in issue,' and whether the judgment would 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Id. (quoting Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 594 (4th Cir. 2004)).

Here, Defendants argue that declaratory relief is inappropriate because Plaintiffs simply seek payment under the SPA, not clarification of any legal rights, and a declaration that Defendants owe Plaintiffs money under the SPA is unnecessary where Plaintiffs also seek monetary damages. (Mot. Dismiss at 11–12). Plaintiffs argue that a judgment declaring the rights of the parties under the SPA is appropriate because it would clarify Defendants' ownership of the P3 Companies and, by extension, their responsibility for the P3 Companies' "several millions of dollars [of] debt . . . ." (Opp'n at 9 n.1; Am. Compl. ¶ 42). Although their request for relief focuses on payment of the promissory notes, (Am. Compl. ¶ 45), Plaintiffs plead facts regarding Defendants' attempt to nullify the SPA and,

14

in turn, avoid ownership of the indebted and struggling P3 Companies, (id. ¶ 42). Thus, declaratory relief could "serve a useful purpose" in answering this ownership question. Butz, 2017 WL 679226, at *3 (quoting Volvo Constr. Equip. N. Am., Inc., 386 F.3d at 594). Even if a declaratory judgment would not address the ownership question, however, Plaintiffs seek a declaration regarding their right to payment under the SPA. (Opp'n at 9; Am. Compl. at 17). And the availability of other legal remedies to address this payment question does not preclude Plaintiffs from seeking a declaratory judgment. See Butz, 2017 WL 679226, at *3 (citations omitted). The Court, therefore, will not dismiss Plaintiffs' request for declaratory relief at this stage of the proceedings.

Second, as to Plaintiffs' request for specific performance, Maryland law considers specific performance to be "an extraordinary equitable remedy" that is available when "more traditional remedies, such as damages, are either unavailable or inadequate." Heravi v. Gaming Network Sols., LLC, No. PWG-15-1178, 2016 WL 3753156, at *6 (D.Md. July 13, 2016) (quoting Archway Motors, Inc. v. Herman, 378 A.2d 720, 724 (Md.Ct.Spec.App. 1977)). A plaintiff, therefore, must plead sufficient facts showing that "specific performance—as opposed to monetary damages—is the necessary remedy." Walgreen Co. v. Meritus Med. Ctr., Inc., No. JRR-22-1151, 2022 WL 2668181, at *5 (D.Md. July 11, 2022) (quoting Heravi, 2016 WL 3753156, at *6).

Here, Plaintiffs contend that monetary damages are inadequate because damages cannot determine "the question of ownership of the P3 entities . . . ." (Opp'n at 9). As stated above, Plaintiffs' request for relief focuses on payment of the promissory notes, but they plead sufficient facts demonstrating Defendants' alleged attempts to avoid ownership of

15

the P3 Companies and their debts. (Am. Compl. ¶¶ 42, 45). While monetary damages could address any alleged breach of the contract, they would not resolve this ownership question or require Defendants to perform their obligations under the SPA, including assuming majority ownership of the P3 Companies. (See SPA at 5). The Court, therefore, will not dismiss Plaintiffs' request for specific performance at this time.

### 2. Count II – Intentional Misrepresentation

In Count II of the Amended Complaint, Plaintiffs bring an intentional misrepresentation claim against CyberPoint3, Cyber Capital, and Gayl. (Am. Compl. ¶¶ 46–50). To state a claim of intentional misrepresentation under Maryland law, the plaintiff must allege that (1) "the defendant made a false representation to the plaintiff"; (2) the defendant either knew the representation was false or made the representation "with reckless indifference to its truth"; (3) the defendant made the misrepresentation "for the purpose of defrauding the plaintiff"; (4) "the plaintiff relied on the misrepresentation and had the right to rely on it"; and (5) "the plaintiff suffered compensable injury resulting from the misrepresentation." Sol v. M&T Bank, 713 F.Supp.3d 89, 111 (D.Md. 2024) (quoting Smith v. Kennedy Krieger Inst., Inc., No. 2241, Sep. Term, 2014, 2017 WL 1076481, at *32 (Md.Ct.Spec.App. Mar. 22, 2017)). Additionally, Rule 9(b) of the Federal Rules of Civil Procedure require a plaintiff to "state with particularity the circumstances constituting fraud or mistake," id., including the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby," Proctor v. Metro. Money Store Corp., 645 F.Supp.2d 464, 473 (D.Md. 2009)

16

(quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)).

Here, Defendants argue that Plaintiffs fail to satisfy Rule 9(b)'s pleading requirements and that Plaintiffs fail to plead justifiable reliance as to any non-binding statements or statements that do not constitute unactionable puffery. (Mot. Dismiss at 12–17). The Court will address each argument in turn.

### a.    Particularity Under Rule 9(b)

Defendants first contend that Plaintiffs do not satisfy Rule 9(b)'s pleading requirements. (Mot. Dismiss at 12–13). As stated above, Rule 9(b) requires a plaintiff to allege the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Proctor, 645 F.Supp.2d at 473 (quoting Harrison, 176 F.3d at 784). Notwithstanding this heightened pleading standard, "[a] court should hesitate to dismiss a complaint under Rule 9(b)" if it finds that (1) "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) [the] plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

Plaintiffs satisfy Rule 9(b) as to some of the alleged misrepresentations in this case. Specifically, Plaintiffs allege the date, place (over email), contents, and speaker (Gayl) of the alleged misrepresentations in the September 24, 2021 Indication of Interest letter, the December 3, 2021 Letter of Intent, Gayl's December 21, 2021 email to Plaintiffs, and the December 24, 2021 Letter of Intent, (see Am. Compl. ¶¶ 14, 19–21), all of which Plaintiffs attach as exhibits, (see generally Sep. 24, 2021 IOI; Dec. 3, 2021 LOI; Dec. 21, 2021 Email;

17

Dec. 24, 2021 LOI). While these documents do not indicate exactly what Gayl gained by making the alleged misrepresentations, Plaintiffs allege throughout the Amended Complaint that Gayl intended to, and did successfully, induce Plaintiffs into executing the SPA by making those alleged misrepresentations. (See, e.g., Am. Compl. ¶¶ 20, 23, 48–49 (alleging that Gayl made misrepresentations to induce Plaintiffs into selling their majority ownership of the P3 Companies; that Plaintiffs relied on the misrepresentations; and that without those misrepresentations, Gayl would not have been able to execute the SPA or use the P3 Companies and Plaintiffs' software to raise capital for his other companies)); see Carroll Co. v. Sherwin-Williams Co., 848 F.Supp.2d 557, 566–67 (D.Md. 2012).[6]

As to the remaining statements—those that Gayl allegedly made "in meetings" on or about September 10, 2021, on September 22, 2021, and on January 5, 2022, (Am. Compl. ¶¶ 14, 15, 17)—Plaintiffs do not allege sufficient contextual facts or provide "substantial prediscovery evidence of those facts," Harrison, 176 F.3d at 784. While Plaintiffs describe the "who, when, and what" of these statements, they fail to allege the "where and how." These broad allegations, though specific as to the speaker, dates, and

---

[6] Defendants also argue that Plaintiffs do not plead falsity as to Gayl's statements regarding his and Cyber Capital's "portfolios." (Mot. Dismiss at 13). The Court disagrees. Plaintiffs allege that Gayl "touted Cyber Capital's 'portfolio' of companies and investment relationships" in the September 24, 2021 Indication of Interest Letter and December 3, 2021 Letter of Intent when in fact, Cyber Capital did not develop a "portfolio" of companies until after the parties executed the SPA. (Am. Compl. ¶¶ 14, 19).

Defendants make the same argument as to the alleged misstatements that Gayl made "in meetings" in September 2021 and January 2022. (Mot. Dismiss at 13; Am. Compl. ¶¶ 14, 15, 17). But as the Court will discuss above, the Court finds that Plaintiffs have not satisfied Rule 9 as to those statements and, therefore, declines to address Defendants' falsity argument.

18

quotes, are insufficient to apprise Defendants "of the particular circumstances for which [they] will have to prepare a defense at trial . . . ." Id.

### b.    Justifiable Reliance

Next, Defendants contend that Plaintiffs fail to plead justifiable reliance because the alleged statements were not legally binding. (Mot. Dismiss at 13–16). There is no requirement, however, that the alleged statements be legally binding, only that they be "material," i.e., facts "on which a reasonable person would rely in making a decision" or that "the maker of the misrepresentation knows the recipient is likely to regard as important." SumCo Eco-Contracting, LLC v. Ellicott Dredges, LLC, No. ELH-20-2930, 2021 WL 2649799, at *15 (D.Md. June 28, 2021) (citation modified).

Defendants also argue that many of the alleged statements are unactionable puffery. (Mot. Dismiss at 16–17). Maryland law "excludes from actionable fraud those statements in a business transaction that are merely 'puffing,'" or statements that "are so frequent and so little regarded in negotiations for a business transaction as to make it unjustifiable for the recipient to rely upon them." First Union Nat. Bank v. Steele Software Sys. Corp., 838 A.2d 404, 442 (Md. 2003) (quoting Restatement (Second) of Torts § 530 (1977)). For example, a seller telling a buyer that the house is "perfectly safe" constitutes puffing because that description is not "a clear and definite representation of any particular fact" but rather an "indefinite generalit[y] of exaggeration." Id. at 443 (quoting Milkton v. French, 150 A. 28, 32 (Md. 1930)). Likewise, "statements about a 'long term mutually beneficial relationship,' 'long term relationship,' 'as we grow, you'll grow,' and 'long term

partners' have no concrete terms[] and are general statements of expectation or opinion" that cannot serve as the basis of an intentional misrepresentation claim. Id. at 443.

In this case, Plaintiffs take issue with Gayl's statements regarding his and Cyber Capital's portfolios, planned investments, and guarantees. (See Am. Compl. ¶ 18). Specifically, in the September 24, 2021 Indication of Interest, Gayl said, "[o]ur Venture Capital portfolio and Private Equity portfolio are designed to accelerate the success of each other" and that Cyber Capital "and our portfolio companies have established market penetration that can open channels for our [Venture Capital] technologies and other [Private Equity] companies." (Sep. 24, 2021 IOI at 2). In that letter, the December 3, 2021 Letter of Interest, and the December 24, 2021 Letter of Intent, Gayl also stated that Cyber Capital "has been 'pre-approved' by several financing partners, including commercial banks and equity investors"; that Cyber Capital would "finance the acquisition and net working capital from commercial banks," private lenders, and institutional funds; that Cyber Capital would "shelter [Plaintiffs] from any personal guarantees related to th[o]se debts"; and that Cyber Capital intended to invest its own capital into the P3 Companies. (Am. Compl. ¶ 18; Sep. 24, 2021 IOI at 5; Dec. 3, 2021 LOI at 8; Dec. 24, 2021 LOI at 10). Additionally, in the December 21, 2021 email, Gayl said, "by March 31, 2022, [Cyber Capital] will have syndicated $4,000,000 investment into Point3 Security, Inc.'s yet to be formed subsidiaries Escalate and Jupiter." (Dec. 21, 2021 Email at 1).

Rather than vague, general statements of opinion, Gayl's statements about portfolios and pre-approvals pertain to potentially material facts. (Sep. 24, 2021 IOI at 2, 5; Dec. 3, 2021 LOI at 8; Dec. 24, 2021 LOI at 10). Whether Gayl and Cyber Capital had portfolios

20

to tout is not a matter of opinion but a matter of fact that could sway Plaintiffs' decision on whether to do business with Gayl and Cyber Capital. The existence of "pre-approvals" from various financing organizations also is a matter of fact that Plaintiffs may regard as important in deciding whether to execute the SPA. Contra Steigerwald v. Bradley, 136 F.Supp.2d 460, 469–70 (D.Md. 2001) (loan officer's statement that defendant was "one of the bank's 'biggest and best customers'" was no "more than an opinion about [defendant]" that could not serve as basis of intentional misrepresentation claim).

Gayl's statements about his and Cyber Capital's future intentions (i.e., Cyber Capital's plans to finance the acquisition, to shelter Plaintiffs from shouldering such debt personally, and to invest its own capital in the P3 Companies) could be actionable as potentially "fraudulent representations of future intentions" to the extent that Gayl did not plan to carry out those intentions at the time that he relayed them to Plaintiffs. The Ritz LLC v. Buddy's River Grill & Oyster Bar LLC, No. 1234, Sep. Term, 2023, 2025 WL 1703469, *17 (Md.App.Ct. June 18, 2025) (quoting Bagel Enter., Inc. v. Baskin & Sears, 467 A.2d 533, 542–43 (Md.Ct.Spec.App. 1983)), cert. denied, 345 A.3d 592 (Md. 2025). Plaintiffs, however, do not allege sufficient facts demonstrating that Gayl did not intend to fulfill those goals at the time that he relayed them to Plaintiffs. Conclusory allegations that Gayl did not have the intent to fulfill those goals simply because the investments did not occur are insufficient. See Bennett v. Ashcraft & Gerel, LLP, 303 A.3d 1237, 1267 (Md.App.Ct. 2023) ("The breach of an alleged promise, alone, does not establish that the promissor never intended to perform the alleged promise. . . . [W]ithout evidence of a present intention not to perform, fraud 'cannot be predicated on statements which are

merely promissory in nature, or upon expressions as to what will happen in the future.'" (citation omitted) (quoting Sass v. Andrew, 832 A.2d 247, 265 (Md.Ct.Spec.App. 2003))).

Accordingly, the Court finds that Plaintiffs' intentional misrepresentation claim survives only as to Gayl's statements in the September 24, 2021 Indication of Interest, the December 3, 2021 Letter of Interest, and the December 24, 2021 Letter of Intent regarding his and Cyber Capital's portfolios and any pre-approvals for financing. (See Am. Compl. ¶¶ 14, 19, 21).

### 3.    Count III – Breach of Fiduciary Duties

In Count III of the Amended Complaint, Plaintiffs assert a derivative shareholder action against Gayl and Scigaj, claiming they breached their fiduciary duty of care owed to the P3 Companies. (Am. Compl. ¶¶ 51–56). To bring a derivative action in federal court, a shareholder-plaintiff must satisfy the special pleading requirements of Rule 23.1(b) of the Federal Rules of Civil Procedure:

> **(b) Pleading Requirements.** The complaint must be verified and must:
> **(1)** allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
> **(2)** allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
> **(3)** state with particularity:
> **(A)** any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> **(B)** the reasons for not obtaining the action or not making the effort.

Rule 23.1(b)(3) is designed to accommodate the common-law "pre-suit demand" requirement, which directs a shareholder, before filing suit, to demand that the directors or

officers of the subject company initiate the lawsuit on the company's behalf. Weinberg ex

rel. BioMed Realty Tr., Inc. v. Gold, 838 F.Supp.2d 355, 357 (D.Md. 2012) (citing Kamen

v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95–97 (1991)). The shareholder may bring a

derivative suit without first making such a demand if they can show that demand would be

futile. Id. (citations omitted). But Maryland's demand futility standard is a "very limited

exception" to the pre-suit demand requirement:

> [The demand futility exception is] to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

Nathanson v. Tortoise Cap. Advisors, LLC, 342 A.3d 507, 533 (Md.App.Ct. 2025)

(quoting Werbowsky v. Collumb, 766 A.2d 123, 144 (Md. 2001)).[7]

---

[7] Federal courts apply "the substantive law of the state of incorporation" when assessing demand futility. Star v. TI Oldfield Dev., LLC, 962 F.3d 117, 134 (4th Cir. 2020). According to the SPA and the Amended Complaint, Point3 Security is a "Delaware company," while P3F is a "Maryland limited liability company." (Am. Compl. ¶¶ 7–8; see SPA at 1; Am. Compl. ¶¶ 7–8). But the Amended Complaint refers to the P3 Companies as one unit and does not specify allegations by company. (See Am. Compl. ¶¶ 30–35, 51–56). The Parties, without dispute, apply Maryland law to the issue of demand futility without differentiating between the two companies or their states of origin. (See Mot. Dismiss at 17; Opp'n at 15–18; Reply at 3–4). Considering this implicit choice of law, the Court also will apply Maryland law. See Timilon Corp., 738 F.Supp.3d at 684 (citations omitted); Legends Title, 659 F.Supp.3d at 650 n.4; see also Great Lakes Dredge & Dock Co. v. City of Chi., 260 F.3d 789, 792 (7th Cir. 2001) ("[C]ourts are entitled, though not required, to apply a body of law chosen by the parties even if this is not the law the court would choose on its own." (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 100 n.5 (1991))).

Here, Plaintiffs allege that they "made repeated demands on Defendants to either pursue [funding] opportunities for the P3 Companies or allow Plaintiffs to pursue such opportunities," (Am. Compl. ¶ 54), and they highlight "specific examples" of their demands that Defendants "take actions consistent with their fiduciary duties to the P3 Companies," (Opp'n at 19; see also Am. Compl. ¶¶ 32–35). These demands, however, do not satisfy the pre-suit demand requirement.

A pre-suit demand must "seek a corporate decision on whether to maintain a lawsuit . . . ." Boland v. Boland, 31 A.3d 529, 549 (Md. 2011) (emphasis added). In other words, the shareholder-plaintiff "must make a demand upon the corporation itself to commence the action" that the plaintiff seeks to initiate derivatively. Werbowsky, 766 A.2d at 135; see also id. at 136 ("[B]efore a stockholder will be permitted to maintain a suit for injury to the corporation, he must allege and prove he requested the directors to institute suit in the name of the corporation, and they refused." (quoting Waller v. Waller, 49 A.2d 449, 453 (Md. 1946))). Asking Defendants to pursue funding and sales opportunities, and questioning their decisions when they choose not to, does not amount to a pre-suit demand for litigation. See, e.g., Gold, 838 F.Supp.2d at 361 (finding that a shareholder advisory vote on the disputed board decision (i.e., executive compensation) "should not be seen as the equivalent of a pre-suit demand . . . for litigation"); JFURTI, LLC v. F. Partners Inv. Mgmt., LLC, No. 16 CIV. 8633 (CM), 2017 WL 1753487, at *12–15 (S.D.N.Y. Apr. 27, 2017) (applying Maryland law and finding that letters plaintiffs sent to directors demanding they take certain actions did not constitute pre-suit demands because the letters did not "demand that the directors investigate and/or bring the . . . claims asserted derivatively").

24

Plaintiffs include no allegations of demands on Defendants to <u>file suit</u> on behalf of the P3 Companies and, therefore, fail to plead pre-suit demand.

Plaintiffs also assert a demand futility argument, contending that any further demands on Defendants would have been futile. (Am. Compl. ¶ 54). They allege that because Defendants rejected their demands to pursue investment and sales opportunities for the P3 Companies, and because Defendants "blocked Plaintiffs' access to the third party servers where the software [that Plaintiffs invented] resides[,] . . . [a]ny additional demands" would have been futile. (<u>Id.</u>). They further allege that Defendants' attempts to nullify the SPA "underscores the futility of any additional demand." (<u>Id.</u>). Finally, Plaintiffs argue that "Defendants' fraudulent misrepresentations . . . , termination of Plaintiffs . . . , and refusal to compensate Plaintiffs" demonstrate that "<u>any</u> demand would have been futile." (Opp'n at 20). These allegations do not satisfy Maryland's demand futility exception.

Plaintiffs seem to argue that Gayl and Scigaj are too "committed to the decision[s] in dispute" to respond reasonably to a pre-suit demand. <u>Werbowsky</u>, 766 A.2d at 144. To the extent that Plaintiffs point to the underlying allegations of misrepresentation, breach of fiduciary duties, and breach of contract as evidence of Gayl and Scigaj's lack of sound business judgment, (<u>see</u> Opp'n at 20), Maryland law does not permit "consideration of the merits of the case in analyzing demand futility," <u>Gold</u>, 838 F.Supp.2d at 361. Putting that argument aside, however, it may be the case that Gayl is too committed to the disputed decisions to respond to a pre-suit demand in good faith where he allegedly refused to pursue funding opportunities for the P3 Companies; directed investment opportunities and funds

to his new company, Eagle Venture Studios, instead of the P3 Companies; and chastised or reprimanded Plaintiffs when they questioned his decisions or sought funding for the P3 Companies on their own. (See Am. Compl. ¶¶ 32–35; Opp'n at 18–19). Scigaj's alleged "refus[al] to pursue potentially lucrative sales opportunities for the P3 companies," (Am. Compl. ¶ 35), on the other hand, seems more akin to "mere participation in or approval of the challenged transaction[s]," which "does not excuse demand," Gold, 838 F.Supp.2d at 361.

Even if the Court were to find that only Scigaj reasonably could have been expected to address a pre-suit demand in good faith, or that either Gayl or Scigaj could have done so, Plaintiffs do not identify Gayl or Scigaj as directors on the board of either P3 Company or allege that any such board delegated the power to control corporate litigation to either Gayl or Scigaj as the companies' officers. See Werbowsky, 766 A.2d at 133 ("[A]ny exercise of the corporate power to institute litigation and the control of any litigation to which the corporation becomes a party rests with the directors or, by delegation, the officers they appoint." (citing Md. Code Ann., Corps. & Ass'ns § 2-401)). Thus, it is not clear from the Amended Complaint that either Scigaj or Gayl had the authority to initiate a lawsuit on the P3 Companies' behalf, even if Plaintiffs had delivered a pre-suit demand to them or to Scigaj alone.

Additionally, the absence of allegations regarding the P3 Companies' boards of directors or Gayl and Scigaj's positions on any such board leaves the Court unable to determine if Gayl makes up a majority of the board such that demand would have been futile. See Nathanson, 342 A.3d at 533 (stating that demand may be futile if a majority of

26

directors are too committed to the decision in dispute to respond to a pre-suit demand in good faith or to exercise sound business judgment (quoting Werbowsky, 766 A.2d at 144)); see also In re Dreyfus Mut. Funds Fee Litig., 428 F.Supp.2d 342, 353–54 (W.D.Pa. 2005) (applying Maryland law and declining to find that demand was futile where plaintiffs did not allege that the nine director-defendants "served on the boards of the two funds owned by plaintiffs, or, if they did, whether they comprised a majority on those boards"). "Without such key information" regarding the P3 Companies' boards of directors or Scigaj and Gayl's positions on them, the Court "cannot make a finding that demand should be excused as futile under Maryland law." In re Dreyfus, 428 F.Supp.2d at 354. Plaintiffs, therefore, have failed to allege pre-suit demand or demand futility, and the Court will dismiss Count III of the Amended Complaint.

### 4.    Counts IV and V – Violations of DTSA and MUTSA

In Counts IV and V of the Amended Complaint, Plaintiffs allege violations of DTSA and MUTSA against CyberPoint3, Cyber Capital, and Gayl. (Am. Compl. ¶¶ 57–77). "To state a claim under DTSA, a plaintiff must allege that: '(1) it owns a trade secret which was subject to reasonable measures of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce.'" Blades of Green, Inc. v. Go Green Lawn & Pest, LLC., 598 F.Supp.3d 348, 355 (D.Md. 2022) (quoting Philips N. Am. LLC v. Hayes, No. ELH-20-1409, 2020 WL 5407796, at *7 (D.Md. Sep. 9, 2020)). Similarly, to state a claim under MUTSA, a plaintiff must allege that "(1) it possessed a valid trade secret, (2) the defendant acquired its trade secret, and (3) the defendant knew or should have known that the trade secret was acquired by

27

improper means." <u>De Simone v. VSL Pharms., Inc.</u>, 352 F.Supp.3d 471, 495 (D.Md. 2018) (quoting <u>Trandes Corp. v. Guy F. Atkinson Co.</u>, 996 F.2d 655, 660 (4th Cir. 1993)).

Here, Plaintiffs allege, and Defendants do not dispute, that the software and related "educational and training methods" that Plaintiffs developed, datasets, technical knowledge, and customer information all constitute trade secrets under DTSA and MUTSA and that Plaintiffs "took reasonable measures to keep its trade secrets confidential and secret." (Am. Compl. ¶¶ 59, 61, 71; Opp'n at 21). The dispute centers on whether Defendants misappropriated or acquired Plaintiffs' trade secrets by improper means. (<u>See</u> Mot. Dismiss at 18–20; Opp'n at 21–23). Defendants argue that under the SPA, "Plaintiffs agreed to give Defendants access to the very trade secrets they now claim were misappropriated," and, therefore, Plaintiffs cannot state a valid claim under DTSA or MUTSA. (Mot. Dismiss at 19).[8] Plaintiffs counter that, through the misrepresentations discussed above, Defendants "defrauded Plaintiffs into parting with" the trade secrets. (Opp'n at 23). Acquisition through fraud, Plaintiffs argue, constitutes acquisition through improper means. (<u>Id.</u>).

Under both DTSA and MUTSA, "'improper means' of acquiring a trade secret 'includes theft, bribery, <u>misrepresentation</u>, breach or inducement of a breach of a duty to

---

[8] Defendants also argue that Plaintiffs fail to allege use or disclosure of the trade secrets. (Mot. Dismiss at 19). But "[a] claim for misappropriation lies 'simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret.'" <u>Philips N. Am. LLC v. Hayes</u>, No. ELH-20-1409, 2020 WL 5407796, at *10 (D.Md. Sep. 9, 2020) (quoting <u>Sys. 4, Inc. v. Landis & Dyr, Inc.</u>, 8 F.App'x 196, 200 (4th Cir. 2001)). Thus, "'<u>acquisition</u> alone is enough to give rise to a' misappropriation claim." <u>Id.</u> (quoting <u>Md. Physician's Edge, LLC v. Behram</u>, No. DKC-17-2756, 2019 WL 4573417, at *5 (D.Md. Sep. 20, 2019)).

maintain secrecy, or espionage through electronic or other means.'" TN Ams. LLC v. Strang, No. JRR-23-242, 2023 WL 8235204, at \*8 (D.Md. Nov. 28, 2023) (emphasis added) (quoting Brightview Grp., LP v. Teeters, 441 F.Supp.3d 115, 132 (D.Md. 2020)); see, e.g., Guthrie Clinic v. Convergence CT, Inc., No. 4:23-CV-01396, 2023 WL 7287251, at \*6 (M.D.Pa. Nov. 3, 2023) (applying DTSA and Pennsylvania trade secrets act and finding defendant acquired plaintiff's trade secrets by improper means when defendant made misrepresentations to induce plaintiff to enter into agreement that gave defendant access to plaintiff's trade secrets); Body Support Sys., Inc. v. Blue Ridge Tables, Inc., No. 1:96CV161-D-A, 1997 WL 560920, at \*6 (N.D.Miss. Aug. 12, 1997) (applying Mississippi trade secrets act and finding that "[c]learly, if a party deceives another into voluntarily providing the deceiving party with a trade secret, that information has been acquired by improper means").

Here, Plaintiffs allege that they executed the SPA and thereby transferred their trade secrets to Defendants because of Defendants' alleged misrepresentations. (See Am. Compl. ¶ 62; Opp'n at 23). As explained above, Plaintiffs plead sufficient facts to state a claim of intentional misrepresentation as to some of the challenged statements. Plaintiffs' allegations of intentional misrepresentation, therefore, serve as the basis for their DTSA and MUTSA claims in that, according to Plaintiffs, Defendants ultimately acquired Plaintiffs' trade secrets via the alleged misrepresentations. Thus, Plaintiffs' DTSA and MUTSA claims survive Defendants' Motion to Dismiss.

29

### 5.    Count VI – Violation of the MWPCL

In Count VI of the Amended Complaint, Plaintiffs allege that all Defendants violated the MWPCL, (Am. Compl. ¶¶ 78–81), which provides that "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment," Md. Code Ann., Lab. & Empl. § 3-505(a).

Here, Plaintiffs allege, and Defendants do not dispute, that Plaintiffs have not been paid all the wages they earned while employed at the P3 Companies, including reimbursement for company expenses. (See Am. Compl. ¶¶ 39–40; Mot. Dismiss at 20–21; Opp'n at 21–24); see also Hencin v. Avant Diagnostics, Inc., No. GJH-19-2546, 2020 WL 5526582, at *6 (D.Md. Sep. 14, 2020) (finding that wages, bonuses, and credit card reimbursements all constitute "wages" under MWPCL). The dispute lies in whether all Defendants constitute "employers" under the MWPCL—Defendants argue that only the P3 Companies count as "employers," while Plaintiffs contend that all Defendants were their "employers" under the MWPCL. (See Mot. Dismiss at 20–21; Opp'n at 21–24).

The MWPCL defines an "employer" as "any person who employs an individual in the State or a successor of the person." Md. Code Ann., Lab. & Empl. § 3-501(b). Notably, an employee "can have multiple employers for MWPCL purposes." Roley v. Nat'l Pro. Exch., Inc., 474 F.Supp.3d 708, 721 (D.Md. 2020), aff'd, 860 F.App'x 264 (4th Cir. 2021); see, e.g., Pinnacle Grp., LLC v. Kelly, 178 A.3d 581, 604–05 (Md.Ct.Spec.App. 2018) (holding that business and business owner both constituted employers under MWPCL).

To determine whether one or more defendants—individuals and entities alike—fall within the MWPCL's definition of an employer, Maryland courts apply the "economic

reality" test. Roley, 474 F.Supp.3d at 722; see also Pinsky v. Pikesville Recreation Council, 78 A.3d 471, 493 (Md.Ct.Spec.App. 2013) (recognizing that the economic reality test applies to both persons and entities). Under this test, "courts consider whether the [putative] employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Roley, 474 F.Supp.3d at 722. "Consideration of these four factors is aimed at assessing the broader question of whether the putative employer played a role in 'causing' the underpayment of the employee and the decision to prioritize other financial obligations." Id. (quoting Campusano v. Lusitano Const. LLC, 56 A.3d 303, 310 (Md.Ct.Spec.App. 2012)). Thus, "courts also consider whether the putative employer had 'operational control over significant aspects of the business' and an 'ownership interest in the business.'" Id. (quoting Campusano, 56 A.3d at 310).

Here, Defendants concede that the P3 Companies were Plaintiffs' employers under the MWPCL. (Mot. Dismiss at 20). Plaintiffs argue that Gayl and Scigaj also were their employers and that CyberPoint3 and Cyber Capital should be held liable as Gayl's alter egos. (Am. Compl. ¶ 79; Opp'n at 23–26).

As to the first factor, Plaintiffs argue that Gayl and Scigaj "had the power to hire and fire Plaintiffs . . . ." (Opp'n at 25). The employment agreement, however, was between Plaintiffs and the P3 Companies; there is no indication that either Gayl or Scigaj was party to that agreement. (See SPA at 11). As the president and managing member of CyberPoint3, (see Am. Compl. ¶ 5), it is possible that Gayl was involved in the decision to

31

hire Plaintiffs as employees of the P3 Companies when developing the SPA, but there are no allegations indicating that Gayl or Scigaj had underline authority to hire or not hire Plaintiffs, Roley, 474 F.Supp.3d at 724. Similarly, Plaintiffs allege that the P3 Companies could terminate Plaintiffs only for cause, incapacitation, or death, and that "the P3 Companies, through Gayl and Scigaj, terminated Plaintiffs without cause." (Am. Compl. ¶ 83). Rather than having unilateral power to fire Plaintiffs, these allegations suggest that Gayl and Scigaj acted on behalf of the P3 Companies. See Grimsley v. SimSpace Corp., No. BAH-24-2907, 2026 WL 477540, at *12 (D.Md. Feb. 19, 2026) (finding that "[a]lthough [CEO] clearly 'exercised some control' over the matter of [plaintiff's] employment, [plaintiff] fails to invoke evidence that [CEO] was acting pursuant to 'unilateral' power, rather than on behalf of" the company-employer).

As to the conditions of Plaintiffs' employment, Plaintiffs argue that Gayl and Scigaj "set the conditions of their employment . . . and, as executives of the P3 companies, had responsibility for maintain[ing] the companies' employment records." (Opp'n at 25). Regarding the second point, the Amended Complaint contains no allegations as to whether Gayl or Scigaj maintained employment records for either Plaintiff. Regarding the first point, Plaintiffs highlight that "Gayl and Scigaj installed their own management team at the company, blocked Plaintiffs' fundraising efforts, routed all sales efforts of the P3 companies' products and services through Defendant Scigaj and blocked Plaintiffs' access to the third party servers where the software resides." (Id.). While Plaintiffs state that they "reported to Mr. Watts as employees of Point 3," (Am. Compl. ¶ 30), they allege facts demonstrating that Gayl determined when and whether to pursue Plaintiffs' suggested

funding projects and determined how much access Plaintiffs could have to the P3 Companies' financial information, (id. ¶¶ 33, 35). It is unclear whether fundraising was Plaintiffs' primary responsibility, though, or if Gayl or Scigaj set the conditions of Plaintiffs' employment as to any other responsibilities. Even so, the above allegations indicate that Gayl exercised "operational control over significant aspects of the business . . . ." Roley, 474 F.Supp.3d at 722 (quoting Campusano, 56 A.3d at 310).

As to the method and rate of Plaintiffs' payments, Plaintiffs argue that Gayl and Scigaj "determined when and whether [Plaintiffs] were to be paid . . . ." (Opp'n at 25). Specifically, Plaintiffs allege that "Gayl and Scigaj have exercised control over the financial and other affairs of [the P3 Companies] to such an extent that they have caused these entities to fail to pay Plaintiffs compensation and bonuses as required under the terms of their employment." (Am. Compl. ¶ 79; Opp'n at 25). Plaintiffs further allege that they "were paid sporadically, from P3 company accounts as well as Cyber Capital accounts and sometimes not at all." (Am. Compl. ¶ 39). The Finance Plan set Plaintiffs' salaries and the process for possible deferred accrual of their salaries. (See SPA at 38–39). Scigaj signed the Finance Plan as Partner and CFO of Cyber Capital and CyberPoint3, (id. at 42), but the document reads like Scigaj is speaking on behalf of Cyber Capital, (see, e.g., id. at 37, 42 ("Cyber Capital Partners, LLC is excited to welcome P3F and Point3 Security to our portfolio! We anticipate a long and fruitful relationship with you and your companies."; "Cyber Capital Partners commits to bringing its full network . . . to support the long-term mission of P3F and Point3 Security . . . . We look forward to implementing this plan to get through the short-term and strength P3F and Point3 Security for future growth.")). Even

33

so, Plaintiffs allege that "Gayl and Scigaj determined how and when Plaintiffs received compensation from the companies." (Am. Compl. ¶ 39).

Overall, the factors are mixed as to whether Gayl and Scigaj were Plaintiffs' employers under the MWPCL. Considering the facts in the light most favorable to Plaintiffs, however, the Court finds that Plaintiffs plausibly state that Gayl and Scigaj were their employers under the MWPCL and that this fact-intensive issue should proceed to discovery.

Finally, Plaintiffs argue that Cyber Capital and CyberPoint3 should be held liable under the MWPCL as Gayl's alter egos. (Opp'n at 25; see also Am. Compl. at 1 (identifying Cyber Capital and Gayl as CyberPoint3's alter egos)). Under the alter ego doctrine, the Court will "pierce the corporate veil" and hold individual shareholders or officers liable for the corporation's wrongdoings when "the corporate entity has been used as a subterfuge and to observe it would work an injustice . . . ." Hildreth v. Tidewater Equip. Co., 838 A.2d 1204, 1210 (Md. 2003) (quoting 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.10 at 574–76 (1999 Rev. Vol.)). What Plaintiffs seek is reverse piercing of the corporate veil, i.e., "[t]he judicial imposition of liability on a corporation for the wrongful acts of an officer, director, or shareholder who is using the corporation as a shield." Ross v. Ross, Nos. 83, 2273, Sep. Term, 2023, 2025 WL 1874631, at *11 (Md.App.Ct. July 8, 2025) (quoting Reverse Piercing the Corporate Veil, Black's Law Dictionary (12th ed. 2024)). There are two types of reverse piercing: insider and outsider:

34

> Insider reverse piercing applies when the controlling [member or shareholder] urges the court to disregard the corporate entity that otherwise separates the [member or shareholder] from the corporation. Conversely, outsider reverse piercing "applies when an outside third party, frequently a creditor, urges a court to render a company liable in a judgment against its member."

Id. (citation omitted) (quoting Sky Cable, LLC v. DIRECTV, Inc., 886 F.3d 375, 385 (4th Cir. 2018)). Plaintiffs are not controlling members or shareholders of either CyberPoint3 or Cyber Capital. So, outsider reverse piercing would apply. But "Maryland courts have never addressed the outsider reverse piercing of the corporate veil." Ross, 2025 WL 1874631, at *12. Even if Maryland recognized outsider reverse piercing, however, Plaintiffs fail to satisfy Maryland's high veil-piercing standard. See Sky Cable, LLC, 886 F.3d at 387 ("In many jurisdictions the same considerations that justify traditional piercing of the corporate veil may justify piercing the veil in reverse." (citation modified)).

Maryland courts apply the alter ego doctrine only in "exceptional circumstances" when a plaintiff shows:

> (1) complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own, (2) that such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights, and (3) that such control and breach of duty proximately caused the injury or unjust loss.

Roley, 474 F.Supp.3d at 726 (quoting Hildreth, 838 A.2d at 1210). Some factors that courts commonly consider when applying the alter ego doctrine are:

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay

35

dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

Id. (quoting Hildreth, 838 A.2d at 1210).

Here, Plaintiffs allege that CyberPoint3 is the "alter ego of Cyber Capital" because it "is inadequately funded and is controlled wholly by Gayl in his position as President of Cyber Capital," (Am. Compl. ¶ 24), but these allegations do not support a finding that CyberPoint3 and Cyber Capital are the alter egos of Gayl. Plaintiffs provide no other factual support for the proposition that CyberPoint3 and Cyber Capital were Gayl's alter egos other than the chain of ownership and Gayl's position as president of both companies. (See id. ¶¶ 3, 5, 25). Plaintiffs' allegations do not suggest that Cyber Capital was inadequately capitalized or that either Cyber Capital or CyberPoint3 failed to observe corporate formalities, issue stock, or pay dividends, or that they operated without a profit. See Roley, 474 F.Supp.3d at 726 (quoting Hildreth, 838 A.2d at 1210). Plaintiffs also do not allege "commingling of corporate and personal assets" other than a brief mention that $2,000,000 "disappear[ed]" from the P3 Companies' financial statements at around the same time that Gayl purchased a $2,000,000 home in Virginia. Id. (quoting Hildreth, 838 A.2d at 1210); (see Am. Compl. ¶ 37). Plaintiffs do not allege that either company had "non-functioning officers or directors" or that either company was or is insolvent. Roley, 474 F.Supp.3d at 726 (quoting Hildreth, 838 A.2d at 1210). And Plaintiffs do not allege an "absence of corporate records" on either company's part. Id. (quoting Hildreth, 838 A.2d at 1210).

36

At bottom, Plaintiffs provide sufficient allegations to proceed to discovery on the issue of whether Gayl and Scigaj were their employers under the MWPCL, but they do not allege sufficient facts to pierce the corporate veil to hold either Cyber Capital or CyberPoint3 liable for Plaintiffs claims under the MWPCL.

### 6.    Count VII – Wrongful Termination

Finally, in Count VII of the Amended Complaint, Plaintiffs allege that all Defendants wrongfully terminated Plaintiffs' employment with the P3 Companies. (Am. Compl. ¶¶ 82–85). "Maryland law recognizes wrongful termination, or wrongful discharge, as a common law exception to the at-will doctrine," which provides that "at-will employment 'can be legally terminated at the pleasure of either party at any time.'" Kelly v. Emerge, Inc., No. RDB-18-2090, 2018 WL 4913867, at *3 (D.Md. Oct. 10, 2018) (quoting Makovi v. Sherwin–Williams Co., 561 A.2d 179, 182 (Md. 1989)). "[T]o establish wrongful discharge, [1] the employee must be discharged, [2] the basis for the employee's discharge must violate some clear mandate of public policy, and [3] there must be a nexus between the employee's conduct and the employer's decision to fire the employee." Id. (quoting Wholey v. Sears Roebuck, 803 A.2d 482, 489 (Md. 2002)). As to the second element, the plaintiff "must demonstrate the policy in question with clarity, specificity and authority," such as through "statutes, prior judicial decisions, and administrative regulations" Id. (quoting Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 309 (Md.Ct.Spec.App. 1995)). Indeed, a wrongful termination claim is "limited to remedying only those discharges in violation of a clear mandate of public policy which otherwise would not be vindicated by a civil remedy." Green v. iMentor, Inc., No. RDB-24-2567,

37

2025 WL 2299432, at *12 (D.Md. Aug. 8, 2025) (quoting Makovi, 561 A.2d at 180), reconsideration denied, No. RDB-24-2567, 2025 WL 3077594 (D.Md. Nov. 4, 2025).

Here, Plaintiffs allege that they were terminated without cause for demanding that Defendants honor the SPA, (Am. Compl. ¶¶ 83–84; Opp'n at 26), but they do not identify "with clarity, specificity and authority" which "clear mandate of public policy" their termination violated, Kelly, 2018 WL 4913867, at *3 (first quoting Bagwell, 665 A.2d at 309; and then quoting Wholey, 803 A.2d at 489). Plaintiffs, therefore, fail to state a claim of wrongful termination.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant in party and deny in part Defendants' Motion to Partially Dismiss (ECF No. 44). A separate Order follows.

Entered this 7th day of August, 2026.

_____/s/_____
George L. Russell, III
Chief United States District Judge
